### YANGTSZE RAPID S. S. CO., Federal Inc., U. S. A., v. DEUTSCH–ASIATISCHE BANK.

#### No. 6637.

Circuit Court of Appeals, Ninth Circuit.
May 16, 1932.

Rehearing Denied June 24, 1932.

latter as "seller" undertook to design, construct, and build for the appellant as the "buyer" one twin screw Diesel motorship in accordance with the specifications attached to said contract for the sum of Tls. 190,000.-00. This contract provided, among other things, that the ship so constructed should be delivered to the appellant on July 1, 1929, and that payment therefor should be made as specified in said contract. On March 25, 1929, a supplemental contract in writing was entered into by the respective parties whereby the cost of the construction of said vessel was to be increased from Tls. 190,000.00 to Tls. 212,400.00. In the latter part of June, 1929, the work on the vessel was about 90 per cent. completed, and the appellant had paid to Seidel, under said contracts, the sum of Tls. 175,000.00 in cash and materials furnished, leaving a balance of Tls. 37,400.00 to be paid by the "buyer" one week after the delivery of the ship in accordance with the terms of the contract.

On or about June 25, 1929, Seidel called upon Lansing Hoyt, the president of the Yangtsze Rapid Steamship Company, and informed him that he (Seidel) was financially embarrassed and did not have sufficient funds available with which to complete the ship under his contract, and requested that the Yangtsze Rapid Steamship Company advance to him funds for such purpose. Hoyt refused to do this, and informed Seidel that he would have to make other arrangements for financing the completion of his contract. Seidel then consulted the officers of the appellee, the Deutsch-Asiatische Bank, with a view to securing a loan, and was advised by the bank that if he (Seidel) would secure from the Yangtsze Rapid Steamship Company an assurance in writing that the balance which he was to receive under his contract, namely, Tls. 37,400.00, when such contract should be completed, would be paid direct to the bank by the Yangtsze Rapid Steamship Company, the bank would make cash advances to Seidel to the extent of Tls. 37,400.-00.

Seidel reported to Hoyt the result of his conference with the officers of the bank, and on June 25, 1929, Hoyt, on behalf of the appellant, wrote a letter to the bank which said:

"This confirms that we will pay to Messrs. Seidel and Company the sum of Tls. 37,400.-00 sixty days after they have turned over the M. V. 'Ichang' ready for operation on the Yangtsze River.

"We have already paid them Tls. 75,000.-

Pillsbury, Madison & Sutro, of San Francisco, Cal., for appellant.

Schuhl & Lurton, of Shanghai, China, and Chickering & Gregory, Donald Y. Lamont, and Blair S. Shuman, all of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and ST. SURE, District Judge.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment of the United States Court for China.

The pertinent facts, as embodied in the narrative "Findings of Fact" of the court below, are substantially as follows:

On or about July 6, 1928, at Shanghai, China, appellant, the Yangtsze Rapid Steamship Company, entered into a contract in writing with one A. C. Seidel, whereby the

00 under our contract, and have opened a confirmed credit covering the Koerting motors for G$65,000. The sum first mentioned is the balance due Seidel & Company after we have thoroughly tried out the vessel."

When the bank received this letter, it considered it insufficient security for the advances which Seidel was requesting them to make. Thereupon the bank sent the letter to Seidel stating that the Yangtsze Rapid Steamship Company must obligate itself to pay the sum of Tls. 37,400.00 directly to the bank, and requested Seidel to obtain from the appellant a confirmation of such suggested obligation on its part. When the matter was again brought to Hoyt's attention by Seidel, Hoyt added the following postscript to his letter of June 25: "P. S. We confirm that this payment of Tls. 37,400.00 will be made direct to you for Seidel & Company's account. (Signed) L. M. Hoyt, President."

Within a few days thereafter Hoyt left China for the United States and did not return to Shanghai until the latter part of October, 1929. In the meantime, the appellee, relying upon the assurance of Hoyt as president of the appellant company that it would pay direct to the bank the sum of Tls. 37,400.00 sixty days after Seidel & Co. turned over the motor vessel Ichang ready for operation on the Yangtsze river, made certain cash advances, amounting to Tls. 37,400.00, to Seidel, between June 25, 1929, and October 25, 1929. All the money so advanced to Seidel was expended by him in an attempt to complete the vessel in accordance with the terms of his contract with the appellant.

When Hoyt returned to Shanghai in the latter part of October, 1929, he learned that the vessel was still under construction and uncompleted, and that an additional expenditure of a large sum of money would probably be necessary in order to complete the ship in accordance with the specifications. Without any notice to the bank and without the bank's knowledge, either actual or constructive, the appellant and Seidel entered into a contract with the New Engineering & Shipbuilding Works, Limited, on November 7, 1929, whereby the last-named company agreed to perform certain services and furnish certain material toward the completion of the vessel for the agreed price of Tls. 28,800.00. This contract provided that the Yangtsze Rapid Steamship Company should "be responsible for payment for all accounts of work performed by the New Engineering & Shipbuilding Works directly to them," and by the same contract the New Engineering &

Shipbuilding Works specifically disclaimed all responsibility "for the running of main machinery, any auxiliaries, for the attainment of the contract speed, draught or dead weight carrying capacity, stability and trim and steering quality."

Before this contract was entered into with the New Engineering & Shipbuilding Works, Seidel, at the request of Hoyt, on or about October 31, 1929, executed and delivered to the appellant a bill of sale of the vessel in question, and at Hoyt's request had removed the uncompleted vessel from Seidel's shipbuilding plant in Shanghai to the shipyard of the New Engineering & Shipbuilding Works in that city.

Between November 7, 1929, and February 7, 1930, Seidel & Co. furnished materials and did certain specified work to complete the ship, and the New Engineering & Shipbuilding Works did likewise according to the terms of the contract.

On February 7, 1930, Seidel & Co. and the New Engineering & Shipbuilding Works jointly turned over the vessel to the Yangtsze Rapid Steamship Company ready for operation after it had been thoroughly tried out, and the ship was accepted by the appellant. Thereafter the appellant paid the New Engineering & Shipbuilding Works the sum of Tls. 38,980.00 for services rendered and materials furnished under its contract with Seidel & Co. and the Yangtsze Rapid Steamship Company for the completion of the vessel.

After the vessel had been accepted by the steamship company, the appellee demanded payment of Tls. 37,400.00 for Seidel & Co.'s account. Such payment having been refused, this suit was instituted on April 19, 1930. The lower court entered judgment against the appellant in the sum of Tls. 37,400.00 with interest at the rate of 6 per cent. per annum from April 7, 1930, to the date of the entry of judgment, July 11, 1931, or a total of Tls. 40,205.00 and costs. Therefrom comes this appeal.

■ At the outset we are confronted with the fact that there is no proper bill of exceptions. Rule 10 of this court provides in explicit language: "2. Only so much of the evidence shall be embraced in a bill of exceptions as may be necessary to present clearly the questions of law involved in the rulings to which exceptions are reserved, and such evidence as is embraced therein shall be set forth in condensed and narrative form, save as a proper understanding of the questions pre-

sented may require that part of it be set forth otherwise."

Here there has been an elimination of things immaterial to an appeal, but all the evidence presented is in dialogue form, not in the narrative condensed form prescribed by the rule. The manner in which the bill has been prepared is similar to that in the case of Wheeling Terminal Ry. Co. v. Russell (C. C. A. 4) 209 F. 795, 797, in which the court said: "The rule [Rule 10, identical with Rule 10 of this court] which has been quoted above was adopted after full consideration. It is believed that compliance with it will not only save useless printing but will enable the court much more intelligently to pass upon the real issues involved. We know that counsel are usually busy. Some time may be saved by turning over the preparation of the bills of exception to stenographers and clerks. Such saving may not, after all, be worth what it costs. It is not impossible that some writs of error would not be sued out at all if counsel took the trouble to extract from the stenographer's notes the precise points upon which they must rely. In almost all cases such a preliminary analysis would make the work of brief making and of oral argument both easier and more effective. The court must require compliance with the rule." See, also, Tingley v. United States (C. C. A. 10) 34 F.(2d) 1, 3; Caldwell v. United States (C. C. A. 10) 36 F.(2d) 738, 739; Smith v. United States (C. C. A. 10) 38 F.(2d) 632, 633; Hard & Rand, Inc., et al. v. Biston Coffee Co. (C. C. A. 8) 41 F.(2d) 625; Hurst v. Killits, 58 F.(2d) 903, decided by this court on May 2, 1932.

This same rule applies to appeals from the United States Court for China. In the case of China Press, Inc., v. Webb, 7 F.(2d) 581, 582–583, this court said: "Counsel take the position that the statutes (sections 649 and 700 [Comp. St. §§ 1587, 1668 (28 USCA §§ 773, 875)]) do not control cases tried in the United States Court for China. In the assumption, acquiesced in by counsel for both sides, that there is no right to a trial by jury in the United States Court for China, we believe counsel are correct, but that does not affect the question here involved, for the statute (Act June 30, 1906, 34 St. L. 814 [Comp. St. §§ 7687–7695, 22 USCA § 191 et seq.]) which created that tribunal provides that writs of error shall be regulated by the procedure governing appeals within the United States from the District Courts to the Circuit Courts of Appeals, and from the Circuit Courts of Appeals to the Supreme Court of the United States, respectively, so far as the same shall be applicable, and that said courts are empowered to hear and determine writs of error so taken. Section 5 of the act (Comp. St. § 7691 [22 USCA § 196]), which provides that the procedure of the court shall be in accordance, so far as practicable, with the existing procedure prescribed for consular courts in China in accordance with the Revised Statutes of the United States, is substantially like that which governed appeals from the former consular courts (Act July 1, 1870, 16 St. 184, § 5) whereby, so far as we are advised, the practice has been in recognition of the requirement that appeals and writs of error from the consular courts in China are subject to the regulations and restrictions prescribed in law for writs of error from District to Circuit Courts. America China Development Co. v. Boyd [C. C.] 148 F. 258. In that case the Circuit Court said: 'Without objection or exception to this testimony, no question would be presented to this court for review upon writ of error, and, while the case comes here on appeal, the statute makes the appeal subject to the rules, regulations, and restrictions prescribed in law for writs of error from District Courts to Circuit Courts. Rev. St. § 4093; U. S. Comp. St. 1901, p. 2771.' "

In the instant case, however, the court made special findings of fact and drew therefrom certain conclusions of law. Exceptions to the conclusions of law were duly preserved by the appellant. The question before us is whether the findings of the trial court support the judgment. This question may be determined without a bill of exceptions. Fleischmann Co. v. United States, 270 U. S. 349, 46 S. Ct. 284, 70 L. Ed. 624.

The appellee earnestly contends that "the assignments of error are wholly insufficient to support any issues whatsoever raised by the appeal." While we agree that the assignments of error are drawn imperfectly and not in strict accordance with the rules of this court, we are disposed to regard them as sufficient to bring the issues of law before us.

Accordingly, we will now proceed to consider the case on its merits.

The court below reached the conclusion that the appellee should have judgment, on the theory that the appellant was a guarantor of Seidel's debt to the appellee. We cannot concur in this view. In our opinion, the document relied upon utterly fails to make even an indirect reference to any principal debt.

Without a principal debt there can be no guaranty.

In 12 R. C. L. p. 1052, § 1, we find the rule thus stated: "A guaranty has been defined by statute to be 'a promise to answer for the debt, default, or miscarriage of another person.' This definition substantially conforms to the judicial conception of a guaranty, which may be fairly summed up as a promise to answer for the payment of some debt or the performance of some obligation, on default of such payment or performance, by a third person who is liable or expected to become liable therefor in the first instance." See, also, 28 C. J. p. 886, § 1.

In the instant case, there was, indeed, a debtor-creditor relation existing between Seidel and the appellee. But the appellant did not undertake to guarantee the payment of that debt. The condition of the appellant's undertaking was not that it would pay the money to the appellee if Seidel did not do so—which would indeed have been a guaranty—but that the appellant would pay a certain sum to the bank, for Seidel's account, when Seidel delivered the vessel to the appellant ready for operation on the Yangtsze river. To us, this seems far from guaranteeing Seidel's debt to the bank.

But, while we do not agree with the reasoning of the lower court, we do concur with the conclusion reached by it. It is not necessary that a judgment be affirmed for the precise reasons that seemed controlling in the lower court. In McCloskey v. Pacific Coast Co., 160 F. 794, 801, 22 L. R. A. (N. S.) 673, the late Judge Gilbert of this court said: "But notwithstanding that the theory upon which the court below awarded its injunction may have been erroneous, the injunction must not be disturbed if in the pleadings and the proofs we may discover any tenable ground upon which it may be sustained." See, also, United States v. Porter Fuel Co. et al. (C. C. A. 8) 247 F. 769, 771; Stoffregen v. Moore, etc. (C. C. A. 8) 271 F. 680, 681; Wineinger v. Union Pacific R. Co. (C. C. A. 8) 276 F. 65, 67.

In its letter to the appellee, the appellant promised to pay Tls. 37,400 sixty days after Seidel & Co. turned over the Ichang ready for operation. The payment, according to the body of the letter, was to be made to Seidel & Co.; but, by the postscript, this was later changed so as to make the sum payable to the appellee, for the account of Seidel & Co.

As we have said before, we are bound by the findings of fact, there being no proper bill of exceptions before us. In those findings there is contained the following unqualified statement: "I further find that on the 7th day of February, 1930, Seidel & Company and the New Engineering & Shipbuilding Works jointly turned over the vessel to the Yangtsze Rapid Steamship Company ready for operation after having been thoroughly tried out, and was thereupon duly accepted by the defendant."

As we read the letter, the delivery of the vessel *by the Seidel firm* was a condition precedent to the promise of the appellant to pay the appellee the sum of money. When Seidel delivered the boat, the promise became absolute and enforceable.

In 13 C. J. p. 564, § 532, we find the following statement: "A condition precedent in the law of contracts either may be a condition which must be performed before the agreement of the parties shall become a binding contract, or it may be a condition which must be fulfilled before the duty to perform an existing contract arises and in this case may consist in performance of his promise by one of the parties or the happening of some other stipulated contingency. The question of whether stipulations in a contract constitute conditions precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation. As is the case with other provisions of the contract, conditions precedent are to be construed in accordance with the true intent and meaning of the parties." See, also, 6 R. C. L. pp. 904–905, § 290.

In the instant case, it is not difficult to arrive at "the true intent" of the parties. The appellant was anxious to receive the vessel, in proper condition, from Seidel. Seidel needed money with which to complete the ship. The bank was ready to lend the money, provided that the sum due to Seidel for completing the ship was made payable to the bank directly. The appellant was willing to make such a promise, on the assumption that the money which the bank would lend to Seidel would be used to enable *him* to make delivery. It had no interest in financing him, other than to make it possible for him to deliver the boat in a condition fit for navigation. If *Seidel* had not made delivery, the appellant would not have owed him the final payment.

Seidel did make delivery, and therefore the condition precedent occurred. Conse-

quently, the appellant is bound to pay the money to the appellee for Seidel's account, as promised.

The fact that Seidel made delivery of the vessel jointly with another firm does not detract from the fact that he himself did participate in the delivery, and therefore, so far as the bank is concerned, the condition precedent was fulfilled. Whether Seidel owes the appellant for part of the money paid by the appellant to the other shipbuilder is not a question that concerns the appellee. That should be settled between the appellant and Seidel, for the appellee was not a party to the later contract, and, indeed, had no notice of it. The appellee's rights should not be prejudiced by any subsequent agreement entered into between the appellant and Seidel, so long as Seidel did indeed actually deliver the ship to the appellant.

Judgment affirmed.