**HURSH et al. v. KILLITS, District Judge.**

No. 6756.

Circuit Court of Appeals, Ninth Circuit.

May 3, 1932.

Rehearing Denied June 6, 1932.

H. L. Arterberry, of Los Angeles, Cal., for petitioners.

Samuel W. McNabb, U. S. Atty., and Paul V. Davis, Asst. U. S. Atty., both of Los Angeles, Cal., for respondent.

Before WILBUR and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

Petitioners ask a writ of mandamus to compel respondent to settle a bill of exceptions in the case of United States of America v. Hursh et al. An order to show cause was issued, and respondent appeared in opposi-

tion to the petition. It appears that petitioners Hursh and others were convicted of a conspiracy to defraud by use of the mails. Thereafter, within due time, petitioners presented a document of 5,000 legal size pages which they styled "Bill of Exceptions." It was in fact a transcript of the testimony with some slight omissions, and was in no sense a bill of exceptions. Hard & Rand, Inc., et al. v. Biston Coffee Co. (C. C. A.) 41 F.(2d) 625; Hood v. United States (C. C. A.) 43 F.(2d) 353; Zurich General Accident & Liability Ins. Co., Ltd., v. Mid-Continent Petroleum Corp. (C. C. A.) 43 F.(2d) 355. The trial judge informed counsel when the matter came on for hearing that the document proposed would not be settled by him as a bill of exceptions, for the reason it did not conform to the rules of the court or the law with reference to bills of exceptions, particularly in that it did not reduce the testimony to narrative form. The trial court, however, gave the petitioners an opportunity to file a new or amended proposed bill of exceptions, and extended the time within which this could be done to and including the 25th day of January, 1932. Petitioners, thus admonished, presented within the time limited a new, or amended, proposed "Bill of exceptions" containing some 3,000 pages. The trial judge refused to settle this proposed bill on the ground that to do so would violate the rules of this court and of the Supreme Court, and filed a memorandum opinion stating the facts and the law as he understood them. An examination of the proposed bill, as amended, substantiates the facts as set forth in the memorandum opinion, and the trial judge was clearly correct in his view of the law. This opinion is as follows:

"Killits, Judge:

■ "The Court finds itself unable to accept the revision of a proffered Bill of Exceptions in this case, filed only for the Court's consideration, January 25, last. This document of 3,073 pages, in our judgment, does not, by a very large measure, meet the requirements for condensation which are carried in Rule 8 of the Supreme Court, a rule clearly governing the trial court. We feel that to certify it as a Bill of Exceptions would plainly violate the mandate of that rule definitely expressed in the first paragraph thereof. By the Court's grace Appellants have now had seven months—June 23, 1931 to January 25, 1932—in which to perform the duty upon them enjoined by the rule in question,—more than ample time to satisfactorily accomplish it. Inasmuch as the proposed Revised Bill, under our order

on January 9, was to be first subjected to our scrutiny to determine whether it complied with the rule which we found, January 9, upon the motion of the District Attorney, was not the case with the first draft upon which appellants had spent over six months, we do not feel justified in thrusting it upon the attention of counsel for appellee to perform the duty which was to be accomplished by appellants.

"The Law Governing the Trial Court.

■■ "A brief résumé of the law is given because we are impressed with the feeling that a primary and inescapable responsibility rests upon this court to see that there is a substantial compliance by appellants with Rule 8 of the Supreme Court (28 USCA § 354), which is identical with Rule 10 of the Circuit Court of Appeals save that the former opens with this paragraph:

" 'The Judges of the District Courts in allowing Bills of Exception shall give effect to the following rules.' Rule 8 of the Supreme Court, as well as Equity Rules (28 USCA § 723), was promulgated under the Act of Feb. 13, 1911 (36 Stat. 901 [28 USCA §§ 865, 866]) which applies 'to every kind of action or suit, where review is sought in a Circuit Court of Appeals.' Barber Asphalt Co. v. Standard Co., 275 U. S. 381, 48 S. Ct. 183, 72 L. Ed. 318. There is no essential distinction as to effect, between Equity and Law Rules regarding Bills of Exception, the latter carrying the same provisions expressed in a more general way. See Caldwell v. U. S. (C. C. A.) 36 F.(2d) 738, 742, certiorari denied 281 U. S. 725, 50 S. Ct. 239, 240, 74 L. Ed. 1143.

"The Supreme Court and several if not all of the Circuit Courts of Appeal are becoming increasingly impatient with trial court neglect to require compliance with the letter and spirit of the rule, Patterson v. Mobile Gas. Co., 271 U. S. 131, 132, 46 S. Ct. 445, 70 L. Ed. 870. This decision cited with approval Newton v. Consolidated Gas Co., 258 U. S. 165, 174, 42 S. Ct. 264, 66 L. Ed. 538, wherein it was said:

" 'These rules were intended to protect the courts against useless, burdensome records and litigants from unnecessary costs and delay. Counsel ought to comply with them, and trial courts should enforce performance of this plain duty.'

"In Krauss Bros. Co. v. Mellon, 276 U. S. 386, 391, 48 S. Ct. 358, 72 L. Ed. 620, the Supreme Court said that, in setting

out the trial record, 'regard should be had to the requirements of paragraph 2, of Rule 7 [now rule 8] prescribed by this court.'

"In Barber Asphalt Co. v. Standard Co., 275 U. S. 384, 48 S. Ct. 183, 72 L. Ed. 318, it was held that a disregard of the provisions in question is not an error which may be overlooked under USCA, tit. 28, § 391 (Jud. Code § 269) as: 'it makes the case difficult of presentation by counsel, and materially augments the task of examination and decision by the court.'

"Although not offered in support of this doctrine a supporting reason exists in the fact that, in the Federal practice, appeal is not a right, but a legislative grace to be enjoyed when a reasonable compliance with conditions precedent is shown.

"For the reason that in the seventh circuit the practice, tacitly condoned by that Circuit Court of Appeals, had been to neglect the rules in question, reversal was declared in 275 U. S. 372, 48 S. Ct. 183, 72 L. Ed. 318, solely because the appellate court had suddenly changed its attitude and had stricken an offending bill, the Supreme Court saying (page 386 of 275 U. S., 48 S. Ct. 183) that that was 'a very severe penalty to impose for action which had the court's implied sanction.' However the Supreme Court's aggravation over the practice was shown by penalizing the appellant in the sum of $5,000 for the benefit of the appellee (page 386 of 275 U. S., 48 S. Ct. 183).

"In the case here we are advised by their counsel that each of the seven appellants will attempt the benefits of the poverty statute to avoid the expense of printing the record, wherefore the court of appeals will be confronted with the inconvenience of a large and complicated manuscript record, unless the government is obliged to incur an irrecoverable expense for printing which will certainly amount to thousands of dollars.

"We are also advised that the District Attorney is ready to consent to the record going up as now prepared, but, because of the Supreme Court's view of the importance of observance of the rule, as shown by the citations given above, and that enforcement is plainly the sole burden of the trial court, it appears that the parties are not competent to waive it. See Rosen v. U. S. [C. C. A.] 271 F. 651, 652. It is probable that if review is sought in the Supreme Court, upon a record so manifestly in disregard of the rule as this would be, as proposed, neither the offending nor consenting party will have an effective standing when asking for the usual writ.

"The Facts.

"This case went to trial March 3, 1931 and closed with judgments June 23. Not all of the time intervening, however, was consumed in trial. There were two interruptions, one lasting practically a week, due to the illness of a juror, another for the major portion of a week due to favor granted the defendants by the court to enable more preparation for defense necessitated by change of counsel for defendant Hursh. The jury was in the taking of testimony during the active weeks excepting one, from Tuesday morning until Friday evening.

"Twenty persons were on trial. There were fifteen convictions, but only seven appeal. Eleven active defense counsel participated.

"Appeal was allowed almost immediately and the appellants enlarged on bond. Four extensions of time to prepare and lodge a Bill of Exceptions, twice without consent of the District Attorney, were granted, expiring with January 5, 1932; wherefore appellants had 196 days within which to comply with the rule in that behalf.

"January 5 appellants completed the lodging of a purported Bill of Exceptions and filed their assignments of error. The lodged document contained 5,041 typewritten pages of large size and carried over seventy per cent of the mass of stenography. The Clerk advises that, following the practice respecting the size of record pages, a typewriting page as used would make 1¼ printed pages.

"Eighty-five assignments of error were carried in 386 typewritten pages of large size. Should this first draft have been certified a complete printed record would have made fourteen volumes of five hundred pages each. Besides the oral testimony there were about 1,200 documentary exhibits, some of great length, the greater number, however, were not carried in the transcript.

"The purported bill carried no index, no notations of transcript paging, and was in such condition that the work of finding any special incident was exceedingly laborious.

"Immediately the District Attorney complained to the Court, that, because of its bulk, and the manner in which the work was cast, a most unusual and unjustifiable labor was thrust upon his office and that generally he must object to the Court's consideration of the tender as a satisfactory draft.

"Three days were spent laboriously, but separately, by the Court and District Attorney's office in examining this tender.

"January 9 the Court granted a written motion of the District Attorney to dislodge or strike from the files and hold for naught this tender as being in plain violation and certain disregard of the provisions, both in letter and spirit, of the rules applicable.

"Aside from its bulk it was plainly evident and finally conceded that the tender was also objectionable because it did not cover some essential portions of the transcript record; among other things was the omission of a special later charge to the jury, at its request and consented to by all defendants, in which some essential features of the main charge were restated in language which was then and there approved by counsel for the defense and submitted without objection and which further made ineffectual, in the nature of waivers, certain exceptions taken to the main charge. Other omissions of less importance were indicated.

"Simultaneously with the making of the Order to Strike the Court ordered suspension of its operation for sixteen days to expire with January 25, within which time appellants might prepare and tender for the court's consideration by way of revision, a substitute and more acceptable draft.

"In the discussion over the District Attorney's motion to strike and the order following and in suggesting where extensive revision by way of reduction was necessary that the second draft might receive the court's approval definite language was used.

"First, that long and tedious copying of contracts, conveyances and the like, the conceded effect of which only was important, should be omitted and these exhibits cited by reference sent up independent of the Bill with other exhibits. This was followed to make a very large reduction in the amount of manuscript.

"Secondly, it was suggested that condensation to narrative form might be considerably extended. This was but partially followed.

"Thirdly, what we termed 'extended loquacious, acute divagations and arguments' between counsel and court had no place in the record except to an extremely limited extent and should be omitted. This injunction was not followed.

"Fourthly, in a general way the purport of the rule was insisted upon, that the bill should be reduced to a minimum for the convenience of the appellate court, consistent with safety to appellants' rights. There were many undisputed facts in the case which could be succinctly stated to the elimination of a large number of manuscript pages.

"January 25, the tentative revision was submitted to the court. It carried 3,074 pages, the last nine of which dealt with a transaction which became public only after the jury had been discharged. It was no part of the stricken bill. About ten days before the close of the case it came to the knowledge of the court that someone had sent to eight of the jurors by mail, a copy of Collier's Weekly containing an article criticizing the efficiency and trustworthiness of circumstantial evidence. At the close of the trial on the day on which this came to the court's knowledge a general comprehensive instruction was given the jury to disregard and as far as possible avoid any publication which dealt with the trial proceedings, or which might have a tendency to influence the jury's thinking. These instructions are not set out in the revision. After the jury was discharged and before its members left their seats we directed those who had received a copy of Colliers to report to the District Attorney preliminary to an investigation of the matter. Thereupon ensued a colloquy between court and counsel covering the nine pages closing the revision and including an exception on part of the appellants that their counsel had not been advised of the court's information while the trial was in progress. We have no question but that this incident is a proper subject for review, but the whole matter can be condensed even including the special instructions given the jury to within three pages.

"The revision also carried the omitted special instruction given to the jury during its consideration of the case.

"The submitted revision effected a reduction of about 2,000 pages from the original tender, but it is still subject, in but a slightly modified degree, only, to every one of the objections we found to the first tender. It is prolix and, to an unbearable degree, offensive to the rule.

"If it should be certified it would make, with the necessary record additions, over nine printed volumes of 500 pages each. As in the case of the first tender it is neither indexed nor does it carry references to transcript paging, so that neither is the finding of testimony nor the identification of any incident possible except by laborious searching.

"Rough classifications of objectionable features are:

"1.   Literally hundreds of pages are unnecessarily occupied with extended colloquies between court and irrepressible counsel who may have been given too much rein through the court's over-amiability.   In a very limited number of instances such matter may be properly included.

"2.   Unnecessary enlargements, substantially useless, consist of extended testimony which affected, severally, certain defendants who are not appellants and some of them not even convicts.   In these cases the court ruled repeatedly that the testimony was receivable only against the one party affected, and only upon the issue of his intent respecting his alleged fraudulent conduct.   An extreme example will be noticed later.

"3.   Hundreds of pages of space, in half pages and whole pages, where it is plainly evident that a great condensation to narrative form is indicated, but the transcript format is literally followed.

"4.   Much of the narrative condensation is so perfunctory that it carries a great deal of immaterial statement and, in many instances where the witness speaks at length in narrative, the substance can, and should be given in much less verbiage.

"5.   The rule requires both condensation and reduction to narrative, when possible. Even a cursory examination shows that the obligation to condense is almost entirely neglected.

"6.   Many other extended features are clearly unnecessary in the amplification which is used.   Condensation would be just as effective in the interests of appellants.

"Examples of Rule Violations.

"The general character of this work exhibits these objections at a glance.   A few instances, which are fairly illustrative, may be noted:

"A—Page 2, line 12, starts over fourteen pages of verbose discussion of appellant Smith's overruled motion for separate trial for delay in receiving a Bill of Particulars.   The essential features of this colloquy, bringing out all of the facts upon which the court ruled that the motion was belated, could be satisfactorily stated in two pages.

"B—At page 56, line 13, begins a nine page controversy over the introduction of copies of the Romola News.   This discussion is renewed later, but it is difficult to locate it for reasons given.   If any of the several exceptions taken at the time is to be relied upon, it is plain that the substance, in full justice to appellants, can be condensed into

less than three pages.   It does not appear that the introduction of the document, there discussed, was finally over objection (page 66).

"C—Pages 211 to 280 carry the testimony of witnesses Dahl and Chehi.   Every page but four of these sixty eight pages is subject to condensation as well as further reduction to narrative, to the saving of over two thirds of the space.

"D—Page 369, line 8, exhibits the start of a heated and somewhat hysterical controversy in which, at times, several defense counsel were talking at once, to the confusion of the court, over the way in which the government became possessed of Romola files.   This continued for forty one pages, the first eleven of which were made while the jury was present.   What the facts were which affected the matter are discussed toward the end of the furor.   If there is any dependence for error in this situation four or five pages of statement are amply sufficient. We must enlarge page 379 by a foot note narrative of fact which is justified if the episode there set out goes into the Bill in its present form.

"E—Pages 419, 420 and 503 to 505, line 23 which set out disquisitions of the court, unobjected to, serve no useful purpose.   Omission would save nearly six printed pages. These are samples of many other unnecessary enlargements of the same general nature.

"F—Page 426, line 31 to 431, line 17, testimony of Gehring, and 492, line 31 to 496, line 20, that of Meyers, set out testimony and colloquies over it, received only as applicable to Bloodgood, a non-appealing convict.   Repeatedly the court stated its narrow office, excluding other defendants from responsibility respecting it.   These are only samples of many instances of this character, affecting the individual cases of non-appellants Bowman, McAfee, Gresham, Christenson and Murphy.   Other Bloodgood testimony is involved.

"G—On page 484, line 28, commences a short discussion respecting a view.   This subject occupies many pages of discussion scattered through the draft.   One noteworthy instance will be later considered.   The matters on pages 484, 485 and 486 serve no useful purpose in the Bill.

"H—Pages 726 to 801 make up an extended exhibit of very incomplete condensation of testimony and record.   Our computation suggests that less than one third of these seventy five pages would have contained all the essentials.

"I—Pages 1150, line 27 to 1154, inclu-

sive is a good example, noted in passing, of colloquy unnecessarily included. There are scores and scores of such instances of inutility, of which that between pages 1231, line 16, and 1235, line 8, is another example.

"J—Witness Mallon was on the stand repeatedly to identify, as stenographer and secretary to the corporation, files produced, signatures, and dictating officers of the corporation. Pages 1236, line 21 to 1250 carry her testimony in full on one of these many occasions. While this section literally reeks with exceptions, it is improbable that errors will be predicated upon any part of it. Even if we are mistaken here, it is obvious that a very large condensation is indicated, as in other instances when she was on the stand. There were few, if any, motions to strike out this evidence.

"K—Hastily scanning these volumes the eye encountered the testimony of Josephine Lee, pages 543 to 567—about twenty five pages. This is a typical example of too much record. In it occurs examples of several objectionable features. Less than eight pages—240 lines—are used for testimony, some of it still subject to condensation. The rest is colloquy. If there is any exception to be dignified by an assignment, two or three pages would suffice to save the point. Much of the record deals with the exclusive interest of Bowman, a non-appellant.

"L—Juror Maier became very ill as the case progressed and died shortly afterward. Pages 1251 to 1255, line 13, carry a colloquy between Court and Counsel on this subject. So much of the tendered bill is clearly unnecessary. Pages 1255, line 14, to 1258, line 8, carry proceedings in which an alternate juror was seated. Pages 17, line 31 to page 24, line 25 carry a discussion and the practice arrived at for qualification and seating of alternate jurors. Toward the close of the record again are set out at some length proceedings in which seated the second alternate juror following the incapacitating illness of Juror Baird. If, as we had hoped would be the case, to settle the practice, error should be assigned respecting the use of alternate jurors, the undisputed facts could be stated in but a page or two of manuscript to a substantial reduction of this record.

"M—We notice five pages of useless matter (1511-1515) of which our recollection suggests that other inclusions of the same character occur. This portion deals with overt act testimony to support the last count of the indictment, later withdrawn by the government.

"N—Immediately follow four pages (1515, line 24-1518) which, manifestly may be condensed sixty per cent, or more.

"O—Everything between line 18, page 1609 and 1614, line 24—five pages, and between 1646 and 1661, line 21, fifteen pages more—catalogues, merely, of exhibits introduced, interspersed with colloquy, is subject to at least an eighty per cent condensation. There are other instances of this precise character.

"P—Newton's testimony (1637-1646) dealing principally, as it does, with the separate cases of McAfee and Gresham, one a non-appellant and the other acquitted, could readily be compressed into two or three pages as to the matters which may be of general interest, i. e., that of the writing up of postdated chicken-unit checks, never delivered to the several payees named therein, but used only as vouchers for special commissions to McAfee and Gresham. Testimony of this character appears from other witnesses.

"R—So far passages are cited which were caught in a cursory examination of the substituted Bill. No attempt has been made to select something more than usually offensive to the rule. But the situation depicted in the 'condensed' record between pages 2014 and 2132 was looked up. This covers most of the testimony of defendant Clark, a non-appellant. A very large part of it is devoted to a subject not in controversy—his qualification as an expert in fig culture. Another large part goes to another question not disputed—whether successful fig raising was generally possible within Romola territory. Pages are used in controversy over a number of proffered photographs. A readily acceptable statement of certain undisputed facts which governed the court's action, condensed from the record, could be set out in little more than a page, to determine the question of error. Needlessly reproduced colloquy occupies many pages. Several pages are carried by way of interruption of discussion over the seating of a second alternate juror, and useless space given again to the question of view. So far as the interest of any of the seven appellants in this part of the record is involved, respecting any debatable question of error, a decent regard for the Supreme Court's rule would reduce these 118 pages to not more than 25.

"The last volume (No. 6—pages 2501 to 3073) has not been looked into for more exemplification of unnecessary and offensive prolixity, except what has been previously said of pages 3065, line 9 to 3072.

"How Large a Bill if Necessary.

"With a recollection of the trial refreshed by a comparison of the tendered Bill of January 5, consisting of over 5,000 pages, with the extended transcript, it is our judgment that every right of each of the seven appellants, including a review of the testimony affecting him on his motion for directed verdict, could be safely and clearly exhibited in a Bill of Exceptions of not over 1500 pages, instead of the 3,072 pages carried by a substitute offered for the Court's consideration January 25. If the abnormal mass of colloquy be eliminated, 1500 pages, such as used in the substitute under consideration, would carry, well toward the end, the testimony of all witnesses in question and answer form.

"Forty eight short days were actually used in the taking of testimony and in the indulgence of colloquy in proportions of, roughly, sixty five and thirty five per cent; by the court's consideration 162 secular days, Sundays and holidays omitted, were allowed appellants, in the first instance, to prepare a record of that testimony which would meet the requirements of Supreme Court rule 8. That, plainly not having been done, 12 additional secular days were allowed to perfect the work, to no successful result. Comparing the short testimony-taking days, little more than four hours, excluding recesses, with an office working day of seven hours, more than five times as many hours were allowed by the Court, before January 5, to prepare the Bill as were actually used in the taking of testimony and the indulgence of verbose colloquy. Appellants were advised, when the first draft was rejected, that the mass of colloquy between court and counsel was especially obnoxious to the rule, yet there is almost an irreducible minimum of reduction in that fertile field noticeable in the revision.

"Unless the Supreme Court should decide to modify its previous holdings respecting the duty of a trial court to enforce observance of its rules to lessen the burdens of reviewing courts, it seems inevitable that for us to settle a Bill of Exceptions substantially as Appellants now propose would be to invite a well deserved rebuke.

"February 10, 1932.

"John M. Killits, Judge."

Upon the argument the petitioners contended that the proposed amended or new bill of exceptions was in conformity with our rule 10, and that it could not be substantially reduced in volume without violating the requirement that, where the appellant attacks the sufficiency of the evidence to sustain the verdict, the bill must contain all of the evidence, citing Krauss Bros. Lumber Co. v. Mellon, 276 U. S. 386, 48 S. Ct. 358, 360, 72 L. Ed. 620. However, the Supreme Court in that case stated that this requirement did not conflict with the rule requiring condensation of the evidence and the statement of the same in narrative form. The court said: "By this it is not meant that the evidence shall be set forth at length in the words of the witnesses, and of the writings and documents admitted, but only that the purport and substance of all of it be included. In setting it forth, regard should be had to the requirements of paragraph 2 of Rule 4 [now rule 8] of the Rules prescribed by this court. 222 U. S. Appendix, p. 8. Lincoln v. Claflin, 7 Wall. 132, 136, 19 L. Ed. 106; Zeller's Lessee v. Eckert, 4 How. 289, 297, 298, 11 L. Ed. 979."

At the hearing petitioners expressed a willingness to conform to the views of this court in amending their proposed bill of exceptions, and apparently sought an expression of our opinion with reference to the requirement that the proposed bill of exceptions must contain all the evidence in the event that the appellant seeks a reversal on the ground that the evidence is insufficient to sustain the verdict. However, that matter has been so thoroughly settled, indeed, it is so fully explained by the very case which petitioners rely upon as requiring so large a transcript, that petitioners must stand or fall on the record as they have made it.

Counsel for petitioners admitted at the hearing of this matter that the evidence in the record is amply sufficient to sustain the verdict as to appellant Hursh and some other petitioners and to establish a conspiracy, and that therefore there can be no review of the evidence upon the assignment of error with reference to the failure of the court to instruct the jury to acquit as to several petitioners. He thus concedes that there is no excuse for an elaborate statement of the evidence with regard to the question of conspiracy, but he does claim on the hearing that other petitioners who are appellants are entitled to rely upon the insufficiency of the evidence to connect them with the conspiracy. It seems clear that, where appellants rely upon the insufficiency of the evidence to connect them with the admitted conspiracy, all of the evidence purporting to connect them with the conspiracy could be submitted in condensed form, and that very briefly. The attorney for the petitioners calls

attention to the fact as he claims that in other similar cases in which he has appeared in this court bills of exceptions of great length, prepared by him substantially as this one was prepared, have been reviewed by this court without protest, and for that reason he invokes the decision of the Supreme Court in Barber Asphalt Paving Co. v. Standard Asphalt & Rubber Co., 275 U. S. 372, 48 S. Ct. 183, 72 L. Ed. 318, reversing a decision of the Circuit Court of Appeals of the Seventh Circuit, wherein that court had affirmed the decree of the lower court and refused to consider a bill of exceptions duly settled and allowed, on the ground that, notwithstanding the allowance and certification thereof as such, it was not in fact a bill of exceptions and could not be considered as such. The Supreme Court held that, inasmuch as the Circuit Court of Appeals had not previously taken that attitude, they should not without warning have affirmed the decree because of the transgression, and that, upon proper terms, it should have remitted the transcript to the District Court to the end that a further opportunity might be had to comply with the rules. The situation here is quite different. The trial judge, instead of ignoring the duty placed upon him to insist upon a condensation of the evidence in narrative form in the bill of exceptions, has insisted that the parties comply with the rules, has given them ample opportunity to do so, and has refused to settle the bill only upon their refusal to comply with the rules of the court and the orders of the trial judge in relation thereto. Counsel has seen fit to stand upon his view of the law and ignore the correct ruling of the trial judge, and is now in no position to contend that further opportunity should be given him to do that which he has knowingly failed and refused to do, namely, to submit bill of exceptions prepared in conformity with the rules of this court.

Petition dismissed.